UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Executive Director of the Office of Vermont
Health Access o/b/o Francis Carey,
        Plaintiff,

v.                                    Civil Action No. 2:08-CV-168

Kathleen Sebelius, Secretary of the United States
Department of Health and Human Services,[1]
        Defendant.

## REPORT AND RECOMMENDATION
(Docs. 11 and 17)

Plaintiff Executive Director of the Office of Vermont Health Access ("OVHA"),

on behalf of Francis Carey,[2] brings this action against Defendant Kathleen Sebelius,

Secretary of the United States Department of Health and Human Services ("Secretary"),

pursuant to 42 U.S.C. §§ 405(g) and 1395ff(b)(1) and 42 C.F.R. § 405.730, seeking

review of the Secretary's decision denying Carey Medicare Part A home health care

coverage for intermittent skilled nursing services provided to him from November 14,

2003 through March 2, 2005.  Pending before the Court are OVHA's Motion seeking an

order reversing the Secretary's decision (Doc. 11), and the Secretary's Motion seeking an

---

[1] Kathleen Sebelius became the Secretary of Health and Human Services on April 29, 2009. Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Sebelius is automatically substituted as the relevant party in this action.

[2] Pursuant to state law, OVHA brings this action as Carey's subrogee to recover the costs of home health services provided to Carey during the relevant service periods.  *See* 33 VSA § 6705(a) ("Upon furnishing medical assistance . . . to any individual, the office of Vermont health access shall be subrogated, to the extent of the expenditure for medical care furnished, to any rights such individual may have to third party reimbursement for such care.").

order affirming the same (Doc. 17).

For the reasons explained below, I recommend that Carey's Motion (Doc. 11) be GRANTED, that the Secretary's Motion (Doc. 17) be DENIED, and that the matter be REMANDED for further proceedings.

## Background

### I.     Procedural History

Carey received home health services from the Rutland Area Visiting Nurse Association ("RAVNA") from November 14, 2003 through March 2, 2005.  More specifically, he received one home health nursing visit and multiple home health aide visits during each of the following consecutive service periods: November 14, 2003 through January 12, 2004; January 13, 2004 through March 12, 2004; March 13, 2004 through May 11, 2004; May 12, 2004 through July 10, 2004; July 11, 2004 through September 8, 2004; September 9, 2004 through November 1, 2004; November 3, 2004 through January 1, 2005; and January 2, 2005 through March 2, 2005.  RAVNA submitted multiple claims to Medicare's contracted fiscal intermediary, Associated Hospital Service ("AHS"), for reimbursement for these services, which claims were denied between February 2, 2005 and December 1, 2005.

OVHA asserted itself as Carey's subrogee, and filed requests for redetermination of the denial of coverage for the home health services provided to Carey.  Between January 13, 2006 and May 2, 2006, AHS denied these requests, issuing unfavorable redeterminations on the grounds that the services provided were not medically reasonable and necessary.  OVHA requested reconsideration from a Medicare qualified independent

contractor, MAXIMUS Federal Services, which issued unfavorable determinations between August 30, 2006 and September 6, 2006.

OVHA timely requested a hearing before an Administrative Law Judge ("ALJ"), which occurred via video teleconference on May 23, 2007. (Administrative Record ("AR") 21, 2724-71.) On June 7, 2007, the ALJ issued a decision finding that the home health services provided to Carey were not reasonable and necessary for treatment of Carey's condition(s), and thus OVHA was not entitled to reimbursement for those services. (AR 20-29.) OVHA requested review of the ALJ decision, and on June 18, 2008, the Medicare Appeals Council ("MAC") adopted the ALJ's decision. (AR 3-8.)

On August 15, 2008, having exhausted all administrative remedies, OVHA filed a Complaint against the Secretary, initiating this action.

## II.     Medical History

Contemporaneous treatment notes from November 2003 through March 2005 reflect that, during the relevant time period, Carey was approximately 81 years old, and diagnosed with Alzheimer's disease, ulcerative colitis,[3] and vascular insufficiency of the intestine. (*See, e.g.,* AR 241, 244, 246, 267, 272, 585, 587, 614, 955, 981, 1287, 1289, 1992, 1315, 1623, 1649, 2291, 2315, 2603, 2605, 2632.) Additionally, Carey was

---

[3] "Ulcerative colitis" is "a chronic disease . . . characterized by ulceration of the colon and rectum, with rectal bleeding, mucosal crypt abscesses, inflammatory pseudopolyps, abdominal pain, and diarrhea." STEDMAN'S MEDICAL DICTIONARY 408 (28th ed. 2006). It frequently causes anemia, hypoproteinemia, and electrolyte imbalance. *Id.*

incontinent, had a colostomy,[4] and had a history of seizures. (*Id.*) Carey had poor endurance, impaired vision and hearing, and difficulties with chewing and swallowing. (*Id.*) He walked with an unsteady and abnormal gait necessitating the use of a cane, and required assistance to care for himself on a daily basis. (*Id.*) Medical professionals described Carey's mental condition as being disoriented, confused, and cognitively impaired; and the records indicate that Carey had mental retardation, memory loss to the point of requiring supervision, and impaired decision-making abilities. (*Id.*) Given all these medical issues, Carey was prescribed approximately eight different medications from November 2003 through March 2005. (*See, e.g.,* AR 432, ¶ 8.)

Carey's treating physician during the relevant time period was Dr. Jeffrey Wulfman. (AR 188-91, 1992.) In November 2003, nurse notes indicate that the skin around Carey's colostomy stoma was red, and that he had a "red rash." (AR 255.) Nurse notes from October 2004 indicate that, on October 16, 2004, Carey was brought to the ER for a "probable seizure," and that, on October 25, 2004, Dr. Wulfman diagnosed Carey with pneumonia and prescribed a new medication. (AR 1992.) The nurse notes from October 2004 further indicate that, in the days following the pneumonia diagnosis, Carey had increased weakness, poor appetite, poor fluid intake, and poor skin tone. (*Id.*) Soon after the pneumonia diagnosis, in November 2004, Dr. Wulfman diagnosed Carey with

---

[4] "Colostomy refers to a surgical procedure where a portion of the large intestine is brought through the abdominal wall to carry stool out of the body." Http://medical-dictionary.thefreedictionary.com/Colostomy (last visited Nov. 18, 2009).

dysphagia[5] and weight loss, and altered his medications.  (AR 2285-89.)

Given Carey's mental and physical deficiencies, as well as his "intricate oral drug regimen," he required significant assistance in daily living, and was unable to leave his home except with the assistance of another individual or the aid of a supportive device. (AR 27.)  Thus, Carey resided with a private, non-skilled caregiver, who assisted him with personal grooming, housekeeping, and managing his colostomy, among other things. (AR 246, 250, 272.)  In addition, as noted above, RAVNA provided one home health nursing visit and multiple home health aide visits during each respective service period from November 14, 2003 through March 2, 2005.  (*See, e.g.,* AR 246-70, 272.)  Each RAVNA visit was documented with an OASIS assessment.[6]  (*Id.*)

Dr. Wulfman determined that Carey required intermittent skilled nursing services, and therefore executed "Home Health Certification[s] and Plan[s] of Care" (hereafter referred to as "Certifications") generally within approximately two weeks of the

---

[5] "Dysphagia" is defined as "[d]ifficulty in swallowing."  STEDMAN'S MEDICAL DICTIONARY 599 (28th ed. 2006).

[6] "OASIS" stands for "Outcome and Assessment Information Set," which the Centers for Medicare & Medicaid Services ("CMS") defines on its website as "a group of data elements that: [r]epresent core items of a comprehensive assessment for an adult home care patient; and [f]orm the basis for measuring patient outcomes for purposes of outcome-based quality improvement." Http://www.cms.hhs.gov/OASIS/02_Background.asp (last modified Jul. 28, 2009).  "[T]he OASIS items have utility for outcome monitoring, clinical assessment, care planning, and other internal agency-level applications."  *Id.*

beginning date of each service period, starting in December 2003.[7]  (AR 244, 585, 953, 1287, 1621, 1962, 2285, 2603.)  These Certifications were based on RAVNA's "Clinical Summar[ies] for Recertification" and attached OASIS Assessments for each respective period.  (AR 246, 587, 955, 1289, 1623, 1965, 2605 (Clinical Summaries); AR 247-71, 589-613, 956-80, 1290-1314, 1624-48, 1967-90, 2290-2314, 2606-31 (OASIS Assessments).)

## Standard of Review

Title XVIII of the Social Security Act, commonly known as the Medicare Act, 42 U.S.C. § 1395 *et seq.*, establishes the federal government's program of health insurance for the elderly.  *Connecticut Dept. of Soc. Servs. v. Leavitt*, 428 F.3d 138, 141 (2d Cir. 2005).  The remedial purpose of the Medicare Act requires that it be broadly construed. *Gartmann v. Sec'y of United States Dept. of Health and Human Servs.*, 633 F. Supp. 671, 679 (E.D.N.Y. 1986), *disagreed with on other grounds in New York ex rel. Bodnar v. Sec'y of Health and Human Servs.*, 903 F.2d 122, 125 (2d Cir. 1990).  "Care must be taken 'not to disentitle old, chronically ill and basically helpless, bewildered and confused people . . . from the broad remedy which Congress intended to provide our senior citizens.'"  *Id.* (quoting *Ridgley v. Sec'y of Dep't of Health, Educ. and Welfare*, 345 F. Supp. 983, 993 (D. Md. 1972), *aff'd*, 475 F.2d 1222 (4th Cir. 1973)).

---

[7] Home health care providers such as RAVNA will not be paid under Medicare unless a physician certifies (and recertifies, where services are furnished over a period of time) that: (i) a patient is "confined to his home" and "needs . . . skilled nursing care" on an intermittent basis; (ii) a plan for furnishing such care has been established and is periodically reviewed by a physician; and (iii) the care is furnished while the claimant is under the care of a physician. 42 U.S.C. § 1395n(a)(2)(A).  As discussed below, however, the physician's certification of these facts does not bind the Secretary to a finding of eligibility.  *See New York ex rel. Bodnar v. Sec'y of Health and Human Servs.*, 903 F.2d 122, 125 (2d Cir. 1990).

Nonetheless, claimants have the burden of proving their entitlement to Medicare benefits. *Friedman v. Sec'y of Dept. of Health and Human Servs.*, 819 F.2d 42, 45 (2d Cir. 1987).

Medicare has two parts, Parts A and B. Medicare Part A is automatic and premium-free; it provides reimbursement for inpatient hospital services, post-hospital extended care services, home health services, and hospice care. *See McCreary v. Offner* 172 F.3d 76, 78 (D.C. Cir. 1999) (citing 42 U.S.C. §§ 1395c-i). Medicare Part B is a voluntary supplemental program that covers medical and other health care services. 42 U.S.C. §§ 1395j-x. This dispute concerns payment for home health services, and specifically skilled nursing services, under Medicare Part A. *See* 42 U.S.C. § 1395d(a)(3).

The Medicare program is administered through private contractors by the Centers for Medicare and Medicaid Services ("CMS"), which is part of the United States Department of Health and Human Services ("HHS"). 42 U.S.C. §§ 1395h, 1395u. The contractors (usually insurance companies) are responsible for making an initial determination on claims under Parts A or B on the basis of regulations and other policies articulated by the Secretary. 42 U.S.C. § 1395ff(a)(1). Contractors responsible for making coverage determinations regarding skilled nursing services are referred to as "fiscal intermediaries." When a claim is filed, a fiscal intermediary, in this case Associated Hospital Service ("AHS"), makes an initial determination regarding whether to pay the claim on the basis of the information provided by the skilled nursing facility, in this case RAVNA. 42 U.S.C. § 1395ff(a)(1); 42 C.F.R. § 405.904(a)(2). If the claimant is dissatisfied with the intermediary's initial determination, he or she is entitled to request

a redetermination by the intermediary, *see* 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.940, and then a redetermination by a qualified independent contractor ("QIC"), in this case Maximus Federal Services, *see* 42 U.S.C. § 1395ff(c)(3)(B)(i); 42 C.F.R. § 405.968.

If the claimant is dissatisfied with the decision of the QIC, and the amount in controversy exceeds a certain threshold amount, the claimant may request a hearing before an ALJ. 42 U.S.C. § 1395ff(d)(1); 42 C.F.R. §§ 405.1000, 405.1002. At that hearing, the claimant has an opportunity to submit new evidence, and, if the intermediary elects to participate in the hearing, the claimant may conduct discovery. 42 C.F.R. §§ 405.1018, 405.1036, 405.1037. If the claimant is dissatisfied with the ALJ's decision, he or she may appeal the decision to the Medicare Appeals Council ("MAC"). 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. §§ 405.902, 405.1100. Finally, the MAC issues a decision, which is subject to review in federal court, *see* 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1130, 405.1136, if the amount in controversy is at least $1,000, adjusted for inflation, *see* 42 U.S.C. § 1395ff(b)(1)(E)(i); 42 C.F.R. § 405.1006(c).

The Medicare statute unambiguously vests final authority in the Secretary, and no one else, to determine whether reimbursement for services should be made. *Bodnar*, 903 F.2d at 125 (citing 42 U.S.C. § 1395ff(a); *Heckler v. Ringer*, 466 U.S. 602, 617 (1984) ("The Secretary's decision as to whether a particular medical service is 'reasonable and necessary' and the means by which she implements her decision . . . are clearly discretionary decisions.")). In evaluating a claim for payment, the Secretary must determine whether the relevant services satisfy the fundamental requirement of 42 U.S.C. § 1395y(a), which requires that the services be "reasonable and necessary for the

diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A); *see New York ex rel. Holland v. Sullivan*, 927 F.2d 57, 58-59 (2d Cir. 1991). This statutory standard gives the Secretary "wide discretion" to determine whether the numerous medical services and items covered by Medicare are reasonable and necessary in particular circumstances. *Willowood of Great Barrington, Inc. v. Sebelius*, 638 F. Supp. 2d 98, 105 (D. Mass. 2009) (citing *Goodman v. Sullivan*, 891 F.2d 449, 450 (2d Cir. 1989)).

To accomplish the task of administering the reasonable and necessary standard, the Secretary acts through formal regulations and informal program manuals. *Willowood*, 638 F. Supp. 2d at 105. "In situations in which the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the [Secretary's] interpretation so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72-73 (1st Cir. 2006) (citing *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150-51 (1991) (internal citations and quotations omitted)). However, pronouncements in manuals like the Medicare Provider Reimbursement Manual ("PRM"), which do not have the force of law, are entitled to "less deference than an interpretation arrived at after a formal adjudication or notice-and-comment rulemaking." *Visiting Nurse Ass'n Gregoria Auffant*, 447 F.3d at 73 (citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

Like the Commissioner's determination of whether a claimant is disabled under the Social Security Act, the Secretary's determination of whether services are reasonable and necessary under the Medicare Act must be based on substantial evidence and be in

accordance with correct legal principles. *See* 42 U.S.C. § 405(g); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gartmann*, 633 F. Supp. at 679 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether substantial evidence exists, the reviewing court analyzes the record as a whole, meaning that, "in assessing whether the evidence supporting the Secretary's position is substantial, [courts] will not look at that evidence in isolation but rather will view it in light of other evidence that detracts from it." *Bodnar*, 903 F.2d at 126 (citing *St. Elizabeth Cmty. Hosp. v. Heckler*, 745 F.2d 587, 592 (9th Cir. 1984)).

While the reviewing court must defer to the Secretary's supported findings of fact, it "is not bound by the Secretary's conclusions or interpretations of law, or an application of an incorrect legal standard." *Gartmann*, 633 F. Supp. at 679. Therefore, "'[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards.'" *Id.* at 680 (quoting *Klofta v. Mathews*, 418 F. Supp. 1139, 1142-44 (E.D. Wis. 1976)); *see Bergeron v. Shalala*, 855 F. Supp. 665, 667 (D. Vt. 1994).

## ALJ Decision

As noted above, the ALJ determined that the home health services provided to Carey were not reasonable and necessary for treatment of Carey's conditions, and thus, they were not covered by Medicare. (AR 20-29.) In her decision, the ALJ acknowledged that Carey had "an extensive medical history, which included unspecified intestinal

obstruction, Alzheimer's [disease], seizure disorder, vascular insufficiency of the intestines, ulcerative colitis, and impaired functional mobility." (AR 27.) The ALJ further noted that, through the dates of service, Carey was "home bound due to poor endurance, history of seizures, and dependence on mobility assistive equipment[,]" and that Carey had a colostomy and followed "an intricate oral drug regimen." (*Id.*)

Despite these findings, the ALJ determined that "the home health visits were not reasonable and necessary," and that the clinical record "clearly establishes that [Carey's] care could have [been], *and was*, safely and effectively . . . performed by a nonskilled individual," rather than by skilled nursing services. (AR 27 (emphasis in original).) Noting that Carey's private caregiver "consistently demonstrated a clear understanding and ability to safely perform" the functions provided at the home health visits, the ALJ stated: "Given the nature of [Carey's] conditions and the effectiveness of his nonskilled caregiver, the home health services at issue were custodial." (*Id.*)

The ALJ further determined that Carey did not require skilled nursing either "for the overall management and evaluation of his care plan[,]" or for "observation and assessment." (AR 27.) The ALJ explained: "[Carey] was in clinically stable condition through the duration of the services at issue. [His] colostomy site was healthy, his vital signs were normal, his treatment regimen was static, and no complications arose proximate to the date of service at issue." (*Id.*) Finally, the ALJ found that Carey did not require patient education services, given that: (1) the relevant dates of service began more than a year after Carey was originally referred for home health care; and (2) Carey's

"nonskilled caregiver already demonstrated an understanding of [Carey's] care plan."

(AR 28.)

## <u>Analysis</u>

Reimbursement for home health services is contingent upon a showing that the claimant is confined to the home, under the care of a physician, in need of skilled services, and under a plan of care. 42 C.F.R. § 409.42(a)-(d). In relevant part, the regulations state as follows:

> To qualify for Medicare coverage of home health services, a beneficiary must meet each of the following requirements:
>
> (a) Confined to the home. The beneficiary must be confined to the home or in an institution that is not a hospital, SNF or nursing facility . . . .
>
> (b) Under the care of a physician. The beneficiary must be under the care of a physician who establishes the plan of care. . . .
>
> (c) In need of skilled services. *The beneficiary must need at least one of the following skilled services as certified by a physician* in accordance with the physician certification and recertification requirements for home health services under § 424.22 of this chapter.
>
> (1) *Intermittent skilled nursing services* that meet the criteria for skilled services and the need for skilled services found in § 409.32. . . .
>
> . . .
>
> (d) Under a plan of care. The beneficiary must be under a plan of care that meets the requirements for plans of care specified in § 409.43.

*Id.* (emphasis added).

It is undisputed that Carey was confined to his home, under the care of a physician, and under a plan of care during the relevant service periods. The disputed issue is whether he required skilled services, and more specifically, intermittent skilled

nursing services. (AR 8-9.) OVHA argues that Carey qualified for Medicare coverage for the home health services provided, and that the Secretary's denial of such coverage is not supported by substantial evidence and violates Medicare laws and regulations. More specifically, OVHA contends the Secretary erred in finding that the services provided to Carey were "custodial" in nature on the principle grounds that (1) Carey was clinically stable during the service periods, and (2) Carey's non-skilled caregiver adequately cared for Carey.

Having considered each of Carey's and the Secretary's arguments (see below), I recommend remanding for further proceedings because the ALJ erred in its application of the law with respect to its treatment of: (a) the Certifications and Report of Carey's treating physician, Dr. Wulfman; (b) the stability of Carey's medical condition during the service periods; and (c) the care provided by Carey's private, non-skilled caregiver during the service periods.

## I.   Treating Physician's Opinion

As noted above, Dr. Wulfman signed Home Health Certifications and Plans of Care ("Certifications") for Carey at or near the beginning of each service period.[8] (*See* AR 244, 585, 953, 1287, 1621, 1962, 2285, 2603.) Therein, Dr. Wulfman certified that Carey was "under [his] care," and that Carey required skilled nursing services to perform the following functions: (1) manage Carey's colostomy status, bowel regime, and pain

---

[8] The Secretary implies that the Certifications' value was diminished because Dr. Wulfman "routinely signed the[m] . . . weeks after the home health agency began providing services." (Secretary's Motion, p. 15.) But the ALJ did not assert this alleged weakness in her decision, and it is unclear why the delayed signing should diminish the Certifications' value, considering that Carey's medical issues were ongoing such that, for the most part, his condition did not materially change within a two-week period.

control; (2) assess Carey's cardiopulmonary status; (3) evaluate Carey's medications and the effects thereof; (4) teach and train Carey's caregivers how to manage Carey's colostomy; and (5) supervise the home health aide services provided to Carey. (*Id.*)

Additionally, on August 1, 2006, approximately 17 months after the DLI, Dr. Wulfman prepared a retrospective Physician's Report ("Report"), wherein he stated that, during the relevant service periods, he treated Carey for weight loss, dysphagia, anemia, seizures, mental retardation, recurrent pneumonia, colitis, chronic diarrhea, and other illnesses. (AR 188.) The Doctor noted that care for Carey required skilled services during those time periods because Carey suffered from "multiple chronic problems[,]" including: he had a colostomy and a gastric feeding tube; he required numerous medications, including medications for seizures; and he was in a state of "intensive medical frailty." (AR 188-90.) Dr. Wulfman further stated that Carey "needed very intense daily care[,]" and continued to weaken during the service periods. (AR 188.) The Doctor explained that skilled nursing care was required to manage Carey's medications, to assess and prevent skin breakdown, to manage Carey's colostomy/ostomy, to maintain Carey's gastric feeding tube, to assess Carey's cardiac and pulmonary status, and to evaluate Carey's need for medical attention with respect to his recurrent pneumonia. (AR 189.)

Although they were discussed at the administrative hearing (*see* AR 2738, 2744, 2747, 2750, *et seq.*), the ALJ did not mention Dr. Wulfman's contemporaneous Certifications in her written decision. She did, however, note the Doctor's August 2006 Report in her decision, stating that it "constitute[d] non-clinical evidence that was

prepared after the dates of service at issue[,]" and thus, that it would "be afforded minimal probative value[.]" (AR 26.) The Court finds that this level of consideration and evaluation of Carey's treating physician's opinions, both contemporaneous and retrospective, was inadequate. *See, e.g., Folland ex rel. Smith v. Sullivan*, No. 90-348, 1992 WL 295230, at *5 (D. Vt. Sep. 1, 1992) (finding error, where ALJ "did not even mention" treating physician's opinion that skilled foot care and instruction was required for 66-year old claimant suffering from diabetes and restricted mobility and requiring careful skin care, a diabetic diet, and observation, to detect signs of deterioration of overall condition).

The Second Circuit has left to the Secretary the initial determination of the weight to be given to a treating physician's opinion in Medicare coverage determinations. *See New York ex rel. Stein v. Sec'y of Health and Human Servs.*, 924 F.2d 431, 433-34 (2d Cir. 1991); *Holland*, 927 F.2d at 60. The "treating physician rule," which was developed by this Circuit to assist courts in reviewing disability benefit claims proceedings, states that the ALJ must give a treating physician's opinion on the nature and severity of a claimant's impairment "controlling weight," so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(d)(2)).

Although the Second Circuit has not explicitly decided whether the treating physician rule applies in Medicare cases, *see Kaplan v. Leavitt*, 503 F. Supp. 2d 718, 723 (S.D.N.Y. 2007) (citing *Keefe v. Shalala*, 71 F.3d 1060, 1064 (2d Cir. 1995); *Stein*, 924

F.2d at 433-34), it has indicated that there is a possibility that some version of the rule could apply, *see Keefe*, 71 F.3d at 1064 (stating that it is "more than possible that some version of the treating physician rule could well apply in Medicare cases").  The Second Circuit stated:

> Though the considerations bearing on the weight to be accorded a treating physician's opinion are not necessarily identical in the disability and Medicare contexts, we would expect the Secretary to place significant reliance on the informed opinion of a treating physician and either to apply the treating physician rule, with its component of "some extra weight" to be accorded to that opinion, . . . or to supply a reasoned basis, in conformity with statutory purposes, for declining to do so.

*Holland*, 927 F.2d at 60 (quoting *Schisler v. Bowen ("Schisler II")*, 851 F.2d 43, 47 (2d Cir. 1988)) (internal citation omitted).  Applying this principle, the Court stated that, "[a]lthough the treating physician rule . . . has not yet been extended to determinations of Medicare Part A benefits, the Secretary should still attach significance to the 'detailed and current opinion of a treating physician.'"  *Dennis v. Shalala*, No. 5-92-CV-210, 1994 WL 708166, at *3 (D. Vt. Mar. 4, 1994) (quoting *Rancourt v. Sullivan*, No. 90-124, 1991 WL 334923, at *5 (D. Vt. Aug. 21, 1991)); *see also Klementowski v. Dept. of Health and Human Servs.*, 801 F. Supp. 1022, 1026 (W.D.N.Y. 1992) (finding "no prohibition against the applicability of the treating physician rule to Medicare cases[,]" but rather, "encourage[ment]" for application of the rule to Medicare cases by *Holland*, 927 F.2d at 60 and *Bodnar*, 903 F.2d at 125-26).  Approximately one month later, the Court reiterated: "[T]he Secretary is expected to place significant reliance on the informed opinion of a treating physician and apply 'some extra weight' to the opinion, or supply 'a

reasoned basis, in conformity with statutory purpose[s], for declining to do so.'"
*Bergeron*, 855 F. Supp. at 668 (quoting *Holland*, 927 F.2d at 60).

Therefore, although the status of the treating physician rule in Medicare coverage cases is still uncertain, it is clear that Second Circuit case law requires ALJs to give some extra weight to the opinion of a treating physician's opinion, or supply a reasoned basis for declining to do so. *Bergeron*, 855 F. Supp. at 668; *see also Smith ex rel. McDonald v. Shalala*, 855 F. Supp. 658, 664 (D. Vt. 1994). In this case, the ALJ did not give extra weight to Dr. Wulfman's contemporaneous or retrospective opinions, and did not supply a reasoned basis for declining to do so. As noted above, the only reference in the ALJ's decision to the opinions of Dr. Wulfman is the statement that Dr. Wulfman's August 1, 2006 Report "constitutes non-clinical evidence that was prepared after the dates of service at issue[,]" and thus, was "afforded minimal probative value." (AR 26.) This statement indicates that the ALJ disregarded, either intentionally or unintentionally, Dr. Wulfman's Certifications, which were in fact contemporaneously prepared and signed by the Doctor at the beginning of each service period. (*See* AR 244, 585, 953, 1287, 1621, 1962, 2285, 2603.)

Clearly, however, the ALJ was at least aware of Dr. Wulfman's Certifications, as she and the Secretary's counsel had a lengthy discussion about them at the administrative hearing. (*See* AR 2738, 2744, 2747, 2750, *et seq.*) Specifically, there was discussion about page two of the OASIS assessments (*see* AR 2759-60), where boxes had been checked to indicate a "severity rating" of "2" with respect to Carey's primary and other diagnoses, and which indicated that such a rating meant "[s]ymptoms [were] controlled

with difficulty, affecting daily functioning; *patient needs ongoing monitoring*." (*See, e.g.,* AR 248 (emphasis added).) In the context of this discussion at the administrative hearing, the ALJ indicated that the Certifications and OASIS assessments were mere "form[s]" that had been "filled out," stating, "that's really the weakness in this evidence, is that it's a check box." (AR 2750, 2760.) The ALJ further stated at the hearing that she "[did not] even know if [Dr. Wulfman] actually ever saw [Carey]." (AR 2750.) But the Certifications themselves state that, by executing them, Dr. Wulfman was certifying that Carey was a "patient . . . under [his] care." (*See, e.g.*, AR 244.) Moreover, there are medical records indicating that Dr. Wulfman did in fact "see" Carey during the service periods. (*See, e.g.*, AR 1992, 2287-89.) Furthermore, although the OASIS assessments consist largely of checked or unchecked boxes, both the Clinical Summaries for Recertification and Dr. Wulfman's Home Health Certifications and Plans of Care contain personal information specific to Carey's condition and needs.

The record reflects that no doctor other than Dr. Wulfman opined on Carey's condition during the relevant time period, and thus, there is no physician evidence in the record which conflicts with Dr. Wulfman's opinions. Moreover, the other medical evidence, including OASIS assessments and nursing notes, supports Dr. Wulfman's opinion that, given the combination of Carey's age, nutritional problems, colostomy, gastric feeding tube, and mental deficits, among other things, a nurse was required to oversee and monitor Carey's care plan. Despite the ALJ's inferences to the contrary, the nurses who treated Carey noted complications and worsening of Carey's overall condition during the service periods. (*See, e.g.,* AR 255 (red rash around stoma); AR

1992 (pneumonia, poor appetite, poor skin color, increased weakening, probable seizure); AR 2291 (dysphagia, weight loss); AR 2311 (nutritional problems).)

For example, there is clear evidence in the record demonstrating that Carey's condition worsened in approximately October-November 2004. Specifically, the November 3, 2004 OASIS assessment includes new diagnoses of "dysphagia" and "weight loss," and they are assigned a "severity rating" of "3" (AR 2291), compared with the "2" rating assigned in prior assessments with respect to Carey's various other diagnoses (AR 1291, 1967). A severity rating of 3 means "[s]ymptoms poorly controlled, patient needs frequent adjustment in treatment and dose monitoring." (AR 2291.) In the same November 2004 assessment, it was noted that Carey ate fewer than two meals per day, ate few fruits and vegetables/milk products, required assistance with meals, and had a nutritional score indicating he was at "[h]igh nutritional risk." (AR 2311.) This is in contrast to: (a) the OASIS assessment from September 2004, approximately two months earlier, where Carey's "Dietary/Nutritional status" was described as being "WNL" (within normal limits), and his nutritional score indicated he was at "[m]oderate nutritional risk" (AR 1986); and (b) the OASIS assessment from May 2004, approximately six months earlier, where Carey's "Dietary/Nutritional status" was again described as being "WNL" (within normal limits), and his nutritional score was "good" (AR 1310). The ALJ failed to mention this probative evidence either at the administrative hearing or in her written decision.

This case is distinguishable from *Cardinal v. Thompson*, No. 2:00-CV-349 (D. Vt. Oct. 26, 2001), cited by the Secretary. Preliminarily, in *Cardinal*, the issue was whether

the claimant was confined to the home, whereas in this case, the issue is whether skilled

nursing services were reasonable and necessary. The relevant facts in *Cardinal* were

that, although the claimant's treating physician had checked the box marked "yes" to

indicate that the claimant's absences from his residence required considerable and taxing

effort, the ALJ and Appeals Council declined to give controlling weight to this opinion.

*Id.* at *12. This Court found that the Appeals Council acted properly, given that the

physician provided no explanation or basis for his conclusion, and there was contrary

evidence in the record. *Id.* at **12-13. In this case, as discussed above, Dr. Wulfman did

not merely check boxes, but rather certified a plan of care which was specifically tailored

for Carey based on Carey's condition at or near the start of each service period.

Moreover, in this case, unlike in *Cardinal*, the evidence in the record is not contrary to

Dr. Wulfman's opinions.

## II.     ALJ's Assessment of Carey's Condition

An ALJ may not substitute his or her own unsupported judgment for that of a

physician. *Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986) ("In

weighing medical evidence to evaluate the reasoning and credibility of a medical expert .

. ., the ALJ may not exercise absolute discretion to credit and discredit the expert's

medical evidence.") (quotation omitted). Instead of weighing Dr. Wulfman's opinion

along with the other clinical evidence, the ALJ improperly substituted her own

independent opinion regarding whether skilled services were needed, based on her ex

post facto interpretation of Carey's vital signs during the service periods. The ALJ

decision states: "[Carey] was in clinically stable condition through the duration of the

services at issue. [Carey's] colostomy site was healthy, his vital signs were normal, his treatment regimen was static, and no complications arose proximate to the date of service at issue." (AR 27.)

First, the ALJ's characterization of Carey's condition as "clinically stable" is not supported by substantial evidence. Rather, the evidence, including Dr. Wulfman's Certifications and nursing notes, reflects Carey's overall infirm condition, considering his age, incontinence, ulcerative colitis, colostomy, history of seizures, diagnosis of Alzheimer's disease, hearing and vision problems, trouble chewing and swallowing, unsteady gait, and mental impairments. *See McDonald*, 855 F. Supp. at 663 (finding that ALJ's conclusion that claimant's condition was "stable" was not supported by substantial evidence, where treating physician noted in certification report that (a) claimant suffered from angina, anemia, cataracts, and memory deficits; (b) claimant's condition was "fragile;" and (c) complications or changes in claimant's condition were probable).

Second, the record belies the ALJ's statement that "no complications arose" during the relevant time period. As noted above, there is medical evidence indicating that in October 2004, which falls within the service periods, Carey was brought to the ER for a "probable seizure," and was diagnosed with pneumonia. (AR 1992.) The medical evidence further indicates that, in November 2004, which also falls within the service periods, Carey was diagnosed with dysphagia and weight loss, and was having severe nutritional problems. (AR 2285, 2291, 2311.) As for Carey's colostomy site, the ALJ's determination that it was "healthy" at all times during the service periods conflicts with November 2003 nurse notes stating that the skin around Carey's colostomy stoma was

red, and that he had a "red rash." (AR 255.) The ALJ at least should have acknowledged these records in her written decision.

Third, and most importantly, it was improper for the ALJ to apply a retrospective analysis to the question of Carey's stability, as such an analysis impermissibly relied on the benefit of hindsight. *See Folland*, 1992 WL 295230, at **6-7 (finding error where the only basis for ALJ's rejection of treating physician's opinion was ALJ's retrospective interpretation of claimant's vital signs); *Bergeron*, 855 F. Supp. at 669. Citing to the Secretary's Home Health Agency Manual, this Court explained:

> "The determination of whether . . . services are reasonable and necessary should be made in consideration that a physician has determined that the services ordered are reasonable and necessary. The services must, therefore, be viewed from the perspective of the condition of the patient *when the services were ordered* and what was, at that time, reasonably expected to be appropriate treatment for the illness or injury throughout the certification period."

*Folland*, 1992 WL 295230 at *7 (quoting Home Health Agency Manual § 205.1(A)(4)) (emphasis in original); *see Colton v. Sec'y of Health and Human Servs.*, No. 90-244, 1991 WL 350050, at *5 (D. Vt. Jan. 30, 1992) ("ALJ was incorrect in applying a retrospective analysis to the question of [claimant's] stability.").

The ALJ's decision states that, because Carey was in a "clinically stable condition" during the service periods (AR 27), Carey did not require skilled nursing services under 42 CFR § 409.33(a)(2)(i), which provides that observation and assessment of a patient's condition may constitute skilled services, but only "until [the claimant's] condition is stabilized." The ALJ continued: "[Carey's] colostomy site was healthy, his vital signs were normal, his treatment regimen was static, and no complications arose

proximate to the date of service at issue." (AR 27.) This Court has held, however, that "[t]he fact that skilled care has stabilized a claimant's health does not render that level of care unnecessary: '[a]n elderly claimant need not risk a deterioration of his fragile health to validate the continuing requirement for skilled care.'" *Bergeron*, 855 F. Supp. at 669 (quoting *Folland*, 1992 WL 295230 at *7); *see* Medicare Benefit Policy Manual § 40.1.1, at p. 36 ("skilled care may, depending on the unique condition of the patient, continue to be necessary for patients whose condition is stable"); *McDonald*, 855 F. Supp. at 663 (stating that it would be "illogical" to hold that, because a claimant did not experience the complications sought to be avoided by the services provided, those services were not reasonable and necessary).

The ALJ's decision misapplied 42 CFR § 409.33(a)(2)(i), and is not supported by substantial evidence, particularly in light of Dr. Wulfman's contemporaneous and retrospective opinions to the contrary. Based on his three plus years of treating Carey, Dr. Wulfman opined that Carey's condition during the relevant time periods was anything but stable. Rather, Dr. Wulfman stated in his retrospective Report that Carey "continued to get more weak," had "multiple chronic problems," and required skilled nursing services "due to multiple care needs [and] frail medical conditions" to "monitor for worsening" of Carey's ongoing ailments and conditions and to ensure Carey did not develop additional problems, such as "[gastric]-tube malfunction, ostomy problems, [and] recurrent pneumonia." (AR 188-89.)

### III.    ALJ's Reliance on Non-Skilled Caregiver's Provision of Services to Claimant

The ALJ's determination that Carey did not require skilled nursing services during the service periods was, in large part, based on the ALJ's finding that, because a non-skilled caregiver adequately cared for Carey during those periods, skilled services were not required.  (*See* AR 27.)  Both the ALJ's written decision and the comments made by the ALJ at the administrative hearing, indicate an overemphasis on Carey's receipt of services from a private, non-skilled caregiver.  For example, the ALJ stated at the hearing: "[H]e didn't need skilled care . . .  I mean, look what he got.  That is not skilled care."  (AR 2745, ll. 13-14.)  In her written decision, the ALJ stated:

> The clinical record clearly establishes that [Carey's] care could have [been], *and was*, safely and effectively . . . performed by a nonskilled individual. Specifically, the skilled nursing notes and OASIS assessments state that [Carey] had a private nonskilled caregiver who was independent with the most complicated aspects of his care . . . .  ¶  Given the nature of [Carey's] conditions and the effectiveness of his nonskilled caregiver, the home health services at issue were custodial.

(AR 27 (emphasis in original).)  The ALJ also noted: "[Carey's] private caregiver consistently demonstrated a clear understanding and ability to safely perform the[] functions [performed by the home health aides and nurses]."  (*Id.*)  Finally, the ALJ stated: "[Carey's] nonskilled caregiver was highly competent and repeatedly demonstrated the ability to safely manage [Carey's] care plan."  (*Id.*)

The Second Circuit has set forth two guiding principles for determining whether a claimant requires skilled nursing care rather than mere custodial care:

> A determination of a Medicare claimant's need for skilled nursing care as opposed to custodial care should be guided by two principles.  First, the decision should be based upon a common sense, non-technical

consideration of the patient's condition *as a whole*.  Second, the Social
Security Act is to be liberally construed in favor of beneficiaries.

*Friedman*, 819 F.2d at 45 (citations omitted) (emphasis added); *see Gartmann*, 633 F.

Supp. at 679 ("[T]he proper legal standard for determining the need for skilled nursing

care involves consideration of the patient's condition as a whole, rather than an analysis

of the specific services provided.").  Rather than basing her decision on Carey's condition

"as a whole," the ALJ improperly focused on the individual services provided by Carey's

private, non-skilled caregiver.

    While it is true that a private, non-skilled caregiver was able to provide Carey's

medication to him and maintain Carey's colostomy on a daily basis (*see, e.g.*, AR 265,

272), among other things, the record demonstrates that nurse visits provided different

functions, including monitoring Carey's vital signs for early indicators of changes or

complications in his conditions and providing patient education, as directed by Dr.

Wulfman (*see, e.g.*, AR 251).  Moreover, common sense dictates that, the mere fact that a

non-skilled caregiver and home health aides provided frequent custodial services to

Carey, including assisting him with bathing, dressing, and feeding (*see, e.g.,* AR 250,

299-320, 2659-81), does not compel a finding that Carey did not require intermittent

skilled nursing services as well.  In *McDonald v. Shalala*, 855 F. Supp. at 663, which

involved an 82-year old claimant who suffered from angina, memory deficits, confusion,

forgetfulness, anemia, and cataracts, the Court applied this principle, concluding that the

ALJ had improperly focused his analysis on the services provided by one nurse instead of

on the aggregate of services provided.  This Court stated:

[T]he ALJ focused his analysis on one of the nurses' services and found that the service was not skilled.  When analyzing the services provided to a beneficiary, the ALJ must concentrate on the aggregate of services provided, 42 C.F.R. § 409.33(a)(1), and the beneficiary's condition as a whole.  While it is true that the nurses put [the claimant's] medications into envelopes for daily consumption, this was only one of the services performed during their visits.  The nurses also monitored [the claimant's] vital signs for early signs of changes or complications in her cardiopulmonary condition and provided patient education.  By concentrating on a specific service, rather than the aggregate of services, and [the claimant's] condition as a whole, the ALJ failed to correctly apply the law.

*Id.* (citations omitted).

To be considered "skilled" under the Secretary's regulations, a service "must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel."  42 C.F.R. § 409.32(a).  However, a patient having conditions which do not ordinarily require skilled services, such as those existing in this case, may require skilled services "because of special medical complications."  42 C.F.R. § 409.32(b).  The Court applied this regulation in *Sawyer v. Sullivan*, No. 90-62, 1991 WL 350049, at *3 (D. Vt. Apr. 17, 1991), which involved an 81-year old claimant who suffered from chronic obstructive pulmonary disease, arterial fibrillation, memory difficulties, and other ailments, stating as follows:

[T]he ALJ found that "the primary concern of the nurse was pre-filling medications" and that "the nursing services were essential to [claimant's] well-being and comfort, but they were not necessarily skilled care", rather supportive care. . . .  However, *such supportive care services may be considered skilled care because of "special medical considerations."*

*Id.* (citing 42 C.F.R. § 409.32(b)) (emphasis added).  The regulations further provide that, even if, as in this case, full recovery or medical improvement is not possible, "a patient

may need skilled services to prevent further deterioration or preserve current capabilities."  42 C.F.R. § 409.32(c).  Finally, of particular relevance here, the regulations state that, "[t]he fact that a skilled nursing service can be or is taught to the beneficiary or to the beneficiary's family or friends does not negate the skilled aspect of the service when performed by the nurse."  42 C.F.R. § 409.44(b)(1)(iii).

Overall management and evaluation of a patient's treatment plan may itself be a skilled service, even where the individual services being provided are not skilled.  42 C.F.R. § 409.33(a)(1); *Colton*, 1991 WL 350050, at *5.  If the patient's overall condition, including his or her age and immobility, supports a finding that recovery and safety can be ensured only if the total care is planned, managed, and evaluated by technical or professional personnel, "it is appropriate to infer that skilled services are being provided." 42 C.F.R. § 409.33(a)(1)(ii).  The Second Circuit explained: "[O]verall management and evaluation of a care plan may be considered a skilled service, and the aggregate of services provided by non-professionals may require the involvement of technical or professional personnel to evaluate and manage their provision."  *Hurley v. Bowen*, 857 F.2d 907, 911 (2d Cir. 1988); *see Sawyer*, 1991 WL 350049, at *3 (remanding because, "[a]lthough the ALJ considered the services provided [to the claimant] individually, he failed to apply the provisions of § 409.33(a)(1) to determine if the combination of services provided could be classified as skilled in light of the claimant's mental condition and the need to provide for her overall management and care").

In this case, the record demonstrates that, pursuant to Dr. Wulfman's Home Health Certifications and Plans of Care, a nurse (Susan Patillo) managed and evaluated Carey's

care. (*See* "Clinical Summar[ies] for Recertification," at AR 246, 587, 955, 1289, 1623, 1965, 2605, and OASIS Assessments, at AR 247-71, 589-613, 956-80, 1290-1314, 1624-48, 1967-90, 2290-2314, 2606-30; *see also* Nurse Notes, at AR 272, 614, 981, 1315, 1649, 1992, 2315, 2632.) Carey's non-skilled caregiver did not provide these services, which, given Carey's fragile medical condition and mental impairments, required the skill and professional expertise of a nurse, in Dr. Wulfman's opinion. The records also demonstrate that, in addition to managing and evaluating Carey's care, a nurse observed and assessed the care provided to Carey by home health aides and his non-skilled caregiver. (*See id.*)

Accordingly, the ALJ erred in basing her denial of coverage for home health services on Carey's receipt of care from a private, non-skilled caregiver. In addition, as discussed above, the ALJ erred in making an ex post facto determination that Carey's condition was "stable" during the service periods. Finally, the ALJ erred in failing to either give "some extra weight" to Dr. Wulfman's contemporaneous Certifications and retrospective Report regarding Carey's condition during the service periods, or to explain her decision to give very little weight to such Certifications and Report.

## Conclusion

Having carefully reviewed the record and the arguments raised in the papers and at oral argument, I find that the Secretary's decision to deny reimbursement for the medicare claims at issue is contrary to law and unsupported by substantial evidence. Accordingly, I recommend that OVHA's Motion to reverse (Doc. 11) be GRANTED, the Secretary's Motion to affirm (Doc. 17) be DENIED, and the matter be REMANDED for

further proceedings consistent with this Report and Recommendation.

Dated at Burlington, in the District of Vermont, this 14th day of December, 2009.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

The parties are advised that any party may object to this Report and Recommendation **_within fourteen (14) days_** after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all other parties, a written objection which shall specifically identify the portion(s) of the proposed findings, recommendations, or report to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule waives the right to appellate review of the District Court's order entered pursuant to this Report and Recommendation. *See* Local Rules 72(a), 72(c), 73; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a), and 6(d).